**NODAK OIL CO., a North Dakota Corporation, Plaintiff,**

v.

**MOBIL OIL CORP., a Foreign Corporation, Defendant.**

**Civ. No. 4846.**

United States District Court,
D. North Dakota,
Southeastern Division.

March 31, 1975.

John Hjellum, Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, N. D., for plaintiff.

J. Gerald Nilles, Nilles, Hansen, Selbo, Magill & Davies, Ltd., Fargo, N. D., Robert C. Fox, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

BENSON, Chief Judge.

### Statement of The Case

Judgment was entered in the above entitled case pursuant to a jury verdict. Actual damages in the sum of $734.42, without interest, and exemplary damages in the sum of $100,000.00, together with costs, were awarded to Plaintiff, Nodak Oil Co. (Nodak).

At the close of all the evidence, Defendant, Mobil Oil Corporation (Mobil), made a Rule 50 motion for a directed verdict. The motion was denied. The matter is now before the Court on Mobil's motion for a judgment in accordance with its motion for a directed verdict, or, in the alternative, for a new trial.

This is a diversity action. Nodak is a corporation organized and existing under the laws of North Dakota with its registered office in Jamestown, North Dakota. Mobil is a foreign corporation organized and existing under the laws of New York, with its principal office in New York.

In April, 1972, Nodak executed an agreement with Jetstream, Incorporated, a North Dakota corporation with its registered office and place of business in the City of Jamestown, North Dakota, for the purchase of a carwash owned and operated by Jetstream in James-

town. The date of sale was to be May 1, 1972, and concurrent with the purchase, the Plaintiff also leased the real property on which the carwash operated.

The primary purpose of the operation was the sale of gasoline. At the time of the sale, Jetstream had a dealers' contract for the purchase of gasoline and motor oil with Mobil. During the week of April 3, 1972, the President and majority stock holder of Nodak, Ray D. Mering, had a discussion with Marvin E. Houchin, the Division General Manager of Mobil, who had jurisdiction over the Division of Mobil which included the State of North Dakota. Mering told Houchin of his desire to become a Mobil distributor in connection with the carwash operation, and to purchase gasoline, oil and other Mobil supplies at distributor prices.

On April 20, 1972, Mering was invited by Ralph Roberts, one of the owners of Jetstream, Inc., to accompany him to Fargo to meet with N. A. Deighton, Fargo District Manager of Mobil, and Herschel Thompson, Area Manager for Mobil, which area included Jamestown. That same day, after returning from the meeting, Mering wrote Deighton acknowledging the visit and restating his desire to operate Jetstream with Mobil products commencing May 1, 1972. He requested confirmation of a proposed arrangement discussed at the April 20th meeting.

On May 1, 1972, Ed Heidzig, a Mobil representative, was on hand to read the pumps at the Jetstream carwash and to ascertain the amount of gasoline in the tanks. On or about the same date, Thompson and Heidzig informed Mering that Nodak could not continue under the contract which Nodak's predecessor, Jetstream, Inc., had with the Defendant. Mobil would not sell to Nodak without a contract. They presented Mering a Retail Dealers Contract, and a withdrawal letter, dated April 28, 1972, and a proposed hauling allowance. The instruments were executed by Nodak at the request of Thompson and Heidzig, and delivered to Mobil. Enclosed with the documents was Mering's letter, which read:

"I have signed the attached Retail Dealer contract, Withdrawal letter, and hauling allowance. I will keep Mobil Products in the Jetstream Car wash if all of the above contracts are approved. I will expect manifest and bill of lading instructions prior to May 10, so that I can immediately begin hauling product. I need product immediately and hope to have bill of ladings by Wednesday, May 3, 1972."

Nodak had been informed it could not buy Mobil products without a contract. On May 11, 1972, a representative of Mobil advised Mering by telephone that the instruments previously signed by Mering had been approved by Mobil, except for the hauling allowance.

Mering then ordered product delivery and thereafter Mobil delivered to Nodak 8,400 gallons of gasoline on each of the dates May 12, May 17, May 25, and May 31, 1972. All the loads were hauled by Transport, Inc., a commercial carrier, and Nodak received a one percent discount for payment within ten days of delivery. Prior to May 26, 1972, the instruments which Nodak signed and delivered to Mobil for execution had not been returned, and during this period, while taking deliveries from Mobil, Nodak, unknown to Mobil, was engaged in negotiating a jobbers contract with Champlin Petroleum Company.

On May 26, 1972, Heidzig and Thompson returned to Mering's office and presented him with an executed Retail Dealer's contract and a letter signed by N. A. Deighton. The letter outlined the competitive allowance, but denied Nodak the right to haul Mobil products. On May 25, Nodak's Mering had written to Mobil's Kansas City office expressing displeasure with its relationship, and on May 31, Mering wrote Mobil a second letter "cancelling the Retail Dealer Contract between Mobil and Jetstream Car wash". The second letter was also sent to Mobil's Kansas City office.

On May 29, 1972, the Cook Sign Company of Fargo was instructed by Nodak to remove the Mobil identification from the Jetstream site and to put up a Champlin sign. Upon being alerted, Mobil's local representative, Thompson, called John D. Olive, the Regional Manager for Champlin Petroleum Company, Sioux Falls, South Dakota, and told him that Mobil had a contract with Nodak.

Champlin then ceased negotiations with Nodak and refused to discuss a jobbers contract until the Mobil matter was cleared up. In response to Mering's letter of May 31, Mobil's attorney wrote Mering, under date of June 6, asserting there was no provision in the contract to terminate it prior to April 30, 1973, and advising that Mobil would not accept the cancellation. Throughout the month of June, 1972, Nodak's attorney requested Mobil to acknowledge that it did not have a "contract" with Nodak. Some time later, Mobil's legal department determined that because Mobil had not accepted all the terms as proposed by Nodak, no contract existed between the two. Mobil advised its representatives of this determination, and on July 19, 1972, N. A. Deighton, its Fargo representative, called John Olive of Champlin, and informed him that Mobil no longer considered it had any contracts with Nodak, and that Champlin Petroleum Company was free to deal with Nodak.

Olive acknowledged the call in a letter to Deighton on July 24, 1972, and asked for an "appropriate instrument of termination of all agreements between Mobil and Nodak." Mobil did not respond to this request, and its explanation for doing so was that it "did not feel it necessary". Nodak thereafter was unable to effect a jobber's contract with Champlin, and brought suit against the Defendant for "unlawfully, oppressively, fraudulently and maliciously" persuading Champlin not to enter into a contract.

### The Applicable Law

The crucial statement upon which this lawsuit rests was the statement by Mobil's representative Thompson to John Olive of Champlin inquiring, "are you aware that Mobil Oil has a contract with Nodak?" This call is alleged to have caused Champlin to withdraw from its intention to make Nodak a Champlin jobber.

The statement can be given two interpretations. First, that a contract document had in fact been executed by both parties. It is Mobil's contention that this was a true representation, and thus could not under any circumstances constitute a basis for fraud. A second interpretation would be that the contract document executed by the parties was legally valid and enforceable. This would be a legal representation, and it is the theory of Mobil that fraud cannot be predicated upon a misrepresentation of law.

■ Before analyzing the two possible interpretations, it becomes necessary, as evidenced by the brief of Mobil, to note the time frame in which the crucial statement was made. The call from Thompson asserting that a contract did exist between Mobil and Nodak was made to Olive, the Regional Manager for Champlin on May 29, 1972. It was not until July 19, 1972, after further examination by Mobil's legal department, that Mobil's Fargo representative advised Champlin's Olive that Mobil had no existing contract with Nodak, and that Champlin was free to deal with Nodak without fear of interference with any contract right of Mobil. The telephone call of May 29, must be viewed in the framework of the time it was made and the information possessed by Mobil's Herschel Thompson at that time. It cannot be equated to the message relayed in July which resulted from the reevaluation of Mobil's legal department as to the validity of the contracts.

In essence, Mobil's position is that the representation made was that a contract existed which did in fact exist. To the extent this representation implied the contract was valid and enforceable, it was a representation of law, which will not support an allegation of fraud. It is

Mobil's contention that considering all the evidence in the light most favorable to Nodak, as a matter of law, Nodak has wholly failed to establish fraud.

■ North Dakota has taken the position, as have other midwestern states, that fraud cannot be predicated upon a misrepresentation of law. The Supreme Court of North Dakota in Hellebust v. Bonde, 42 N.D. 324, 172 N.W. 812 (1919) stated:

"It is true that our Code, in laying down the elements of an action to recover damages for deceit (sections 5943, 5944, Compiled Laws of 1913 [now sections 9–10–03 and 9–10–02 NDCC] bases the action upon misrepresentation or suppression of facts or upon a promise made without any intention of performing it; and thus, by excluding misrepresentations of law, impliedly, at least, enacts the rule that such misrepresentations do not give rise to an action for deceit. But, since forms of action are entirely abolished by section 7355, Compiled Laws of 1913, we are not seriously concerned with the question as to whether or not the complaint comprises all of the allegations necessary to state a cause of action for deceit. It is sufficient, as against demurrer, if it states a cause of action at all.

We are not to be understood as holding, however, that the complaint is necessarily deficient as a statement of a cause of action in deceit, *but only that, in so far as the action may be thought to be predicated upon a misrepresentation of law, it cannot be regarded as an action for deceit under section 5944, Compiled Laws of 1913.* The complaint contains allegations of fact from which a promise by the defendants may be implied to pay over the $500 to the government of the United States and to Divide county, which promise, it is reasonable to be inferred from the allegations, there was no intention to perform; and under paragraph 4 of section 5944, Compiled

Laws of 1913, an action for deceit may be grounded upon 'a promise made without any intention of performing.'" (emphasis added) 172 N. W. at 813.

Other cases which have applied this principle include Loringer v. Kaplan, 179 Neb. 215,' 137 N.W.2d 716, 718 (1965); Alexander v. Randall, 257 Iowa 422, 133 N.W.2d 124, 127 (1965); Bentley v. Fayas, 260 Wis. 177, 50 N.W.2d 404, 408 (1951); Henvit v. Keller, 218 Minn. 299, 15 N.W.2d 780, 782 (1944); Stark v. Equitable Life Assur. Soc., 205 Minn. 138, 285 N.W. 466, 468 (1939); Krushew v. Meitz, 276 Mich. 553, 268 N.W. 736, 738 (1936).

■ A brief explanation and definition of terms is in order. Plaintiff's cause of action is grounded in tort and not contract. In North Dakota, the concept of fraud enters into both the contract and tort fields. If a contract has been induced by fraud, actual or constructive, the contract is voidable for the same reason that mistake, undue influence, duress, etc., render the contract voidable; namely, that fraud, actual or constructive, mistake, undue influence and duress vitiate consent. NDCC § 9–03–03 in the chapter entitled "Consent" provides as follows:

"What renders apparent consent not free.—An apparent consent is not real or free when obtained through:

1. Duress;

2. Menace;

3. Fraud;

4. Undue Influence; or

5. Mistake."

Actual fraud is defined in § 9–03–08 of the same chapter as being:

"1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which

is not true though he believes it to be true."[1]

■ This is the contract definition of actual fraud upon which the remedy or cause of action for rescission can be based.

On the other hand, in the tort area a cause of action can be based upon actual fraud and this cause of action is known as deceit, Beare v. Wright and Bates, 14 N.D. 26, 103 N.W. 632 (N.D.1905). Technically, therefore, Nodak's cause of action is one for deceit as defined in § 9–10–02 as follows:

"1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The assertion of a fact of that which is not true by one who has no reasonable ground for believing it to be true;"[2]

The subsection 1 definitions of fraud in both statutes as a basis for an action are identical. The subsection 2 definitions are different. The import of the difference is that a plaintiff has a greater burden in a tort action based on an allegation of fraud than he has in the contract action for rescission, also based on an allegation of fraud. In the tort action, plaintiff must prove under subsection 2 that the assertion of fact was made by one who had *no reasonable grounds* for believing it to be true, whereas under the contract definition subsection 2, the plaintiff need only prove the assertion was made in a manner not warranted by the information of the person making it.[3]

■ Nodak argues that past case law asserting the principle that fraud cannot be predicated upon a misrepresentation of law involved misrepresentation by a defendant to a plaintiff. Because the alleged misrepresentation in the instant case was made by Mobil to a third party and not to Nodak, the plaintiff, Nodak, does not find the cases analogous to its situation. This argument is without merit. The Court is unable to determine how the principle upon which fraud has been litigated in the prior cases can be distinguished solely because the misrepresentation was made to the third party, rather than to the plaintiff, when the plaintiff nonetheless depends on that alleged misrepresentation for its right to recover actual and punitive damages.

### The Alleged Acts of Fraud

Nodak argues that Mobil committed several fraudulent acts but seems to rely

---

1. The entire statute reads:
"9–03–08. 'Actual fraud' defined.—Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:
1. The suggestion as a fact of that which is not true by one who does not believe it to be true;
2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;
3. The suppression of that which is true by one having knowledge or belief of the fact.
4. A promise made without any intention of performing it; or
5. Any other act fitted to deceive."

2. The entire statute reads:
"9–10–02. Deceit—Definition.—A deceit within the meaning of section 9–10–03 is:

1. The suggestion of a fact of that which is not true by one who does not believe it to be true;
2. The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;
3. The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
4. A promise made without any intention of performing."

3. In its instruction to the jury, the Court used the definition of fraud found in § 9–03–08 NDCC. It appears this was error, and that the definition should have been that as set out as "Deceit" in § 9–10–02 NDCC. Nodak relies on Gershman v. Engelstad, 160 N.W.2d 80 (N.D.1968), for its definition of fraud, but the North Dakota Supreme Court in *Gershman* was passing on an allegation of fraud arising out of contract.

282

principally on the statement by Mobil's Thompson to Champlin's John Olive by telephone on May 29, 1972. As hereinbefore shown, Thompson inquired whether Champlin was aware of the fact that Nodak had a contract with Mobil for furnishing retail gasoline at the Jetstream station. Champlin was unaware of such a contract and thereupon took its sign off the Jetstream station. On June 30, 1972, it advised Nodak, by letter, that further negotiations were needed with respect to misunderstandings between Champlin and Nodak on the proposed jobber's agreement, but that Nodak was not in a position to negotiate further if a contract existed between Nodak and Mobil. Champlin asked Nodak for evidence from Mobil that no contract existed between Nodak and Mobil.

■ To raise a jury question, there must be competent evidence that Mobil affirmatively asserted as a fact something it had no reasonable ground for believing it to be true, and that Champlin relied on that statement to Nodak's detriment.

■ It is the opinion of the Court that the evidence on this is such that reasonable persons could reach but one conclusion. At the time Mobil telephoned Champlin informing Champlin that Nodak was under contract to Mobil, both Nodak and Mobil believed there was an existing contract, albeit the validity may have been in dispute. After Mobil's representative advised Nodak's Mering by telephone that the Retail Dealer's contract, but not the hauling allowance, had been approved, an understanding was reached which caused Mobil to commence product delivery and Nodak to accept those deliveries. A contract, effective as of May 1, 1972, was in fact signed by both parties and delivered to Nodak on May 26, 1972. At trial, Mering's explanation was that it was but a thirty day contract. This is directly contradicted by Mering's own letters under date of May 25, advising of his plan to terminate the "relation-

ship", and under date of May 31, advising "I am hereby cancelling the Retail Dealer Contract between Mobil and Jetstream Car Wash". It was also contradicted by the contract instrument itself, which provides for a one year term. As hereinbefore mentioned, Mobil's response to this was the letter from its legal department threatening legal action. In any event, whether it was a thirty day contract or a one year contract, the uncontroverted evidence established that at the time of Mobil's telephone call to Champlin, a contract of some sort did in fact exist.

A later determination of non-validity by Mobil does not void the belief of its representative, Thompson, a non-lawyer, on the 29th of May, as Nodak would suggest. Nodak produced no evidence that Thompson had the authority, ability, or responsibility, to adjudge the validity of the contract. Further, the facts fail to raise an inference of an intent to deceive. The evidence of the swift reconsideration and determination of the validity of the total contract package by Mobil's legal department, once the controversy arose, raises an inference of Mobil's good faith.

■ An analysis of Nodak's allegation of other fraudulent acts by Mobil and the evidence it offered in support of those allegations must be considered in the context of the competitive business situation that existed. Mobil and Champlin were competitors, both of whom were initially interested in doing business with Nodak. Nodak was privileged to negotiate the most favorable contract it could with either Mobil or Champlin, and it could carry on simultaneous negotiations with each without disclosing to one that it was negotiating with the other, which it did. Likewise, Mobil and Champlin each had the privilege of negotiating the best deal it could with Nodak to the exclusion of the other, even though the deal may be less than desired by Nodak. In such a situation where all the facts of the simultaneous negotiations subsequently become known, it is not unusual for one or more

of the parties to lose interest in pursuing a contract or a business relationship. These are the commonly recognized and assumed risks of the competitive business world, all of which public policy has recognized as desirable in stimulating competition, which is usually of ultimate benefit to the consumer.

Nodak succeeded in convincing Mobil it did not have a legally enforceable contract, but its simultaneous dealings with both companies appears to have caused both to lose interest. On July 19, Mobil notified Champlin by telephone of its position change on the matter of whether it had a valid contract with Nodak, but Champlin did not attempt to re-open negotiations or even notify Nodak of its communication from Mobil. It did ask Mobil for copies of appropriate instruments of contract termination, which request was ignored by Mobil. Apparently, Mobil reasoned if it had no contract, there was nothing to terminate. Likewise, Nodak did not continue to pursue Champlin, and it was getting product delivery from another source at lesser cost. It was only when the energy "crunch" struck in the latter part of 1972 that the controversy came alive.

As evidence of Mobil's other "fraudulent acts", Nodak points, inter alia, to Mobil's attempt to secure a Nodak retail dealer's contract without agreeing to the hauling allowance; Mobil's failure to advise Champlin on May 31 that it did not have a contract with Champlin; Mobil's failure to advise Mering of its July 19 call to Champlin advising of its changed position on the contract dispute; Mobil's failure to furnish Champlin with its requested instruments of contract termination.

Nodak's cause of action is grounded on Mobil's alleged fraudulent persuasion of Champlin to not enter into a jobber's contract with Nodak. As frequently happens in the course of competitive business negotiations, these acts by Mobil were obviously not designed to endear it to Nodak but they fall short, as a matter of law, of proving the direct fraud or coercion that is required to support a jury verdict. *See* Voss v. Becko, 192 F.2d 827 (8th Cir. 1951).

It is ordered the verdict of the jury and the judgment entered thereon is set aside and that judgment be entered for dismissal of the action.