NODAK OIL CO., a North Dakota Corporation, Appellant,

v.

MOBIL OIL CORP., a Foreign Corporation, Appellee.

No. 75–1309.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 19, 1976.
Decided April 13, 1976.

John Hjellum, Hjellum, Weiss, Nerison, Jukkala & Vinje, Jamestown, N. D., for appellant.

J. Gerald Nilles, Nilles, Hansen, Selbo, Magill & Davies, Fargo, N. D., for appellee.

Before MATTHES, Senior Circuit Judge, LAY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

This diversity action was initiated by plaintiff-appellant Nodak Oil Co. (Nodak) in the United States District Court for the District of North Dakota.[1] On Nodak's claim that defendant-appellee Mobil Oil Corp. (Mobil) fraudulently persuaded Champlin Oil Co. (Champlin) not to enter into a contract with Nodak, a jury returned a verdict on October 9, 1974, in favor of Nodak for actual damages in the sum of $733.42 and exemplary damages in the sum of $100,000. Mobil then made a motion for judgment notwithstanding the verdict in accordance with its motion for a directed verdict, or, in the alternative, for a new trial. On March 28, 1975, the trial court entered a judgment in which the verdict of the jury and the judgment entered pursuant thereto were set aside, but did not rule on the alternative motion for a new trial. *Nodak Oil Co. v. Mobil Oil Corp.*, 391 F.Supp. 276 (D.N.D.1975).

An appeal was made to this court and on November 28, 1975, we remanded for the district court to make a conditional ruling on the alternative motion for a new trial as is required by Fed.R.Civ.P. 50(c)(1). *Nodak Oil Co. v. Mobil Oil Corp.*, 526 F.2d 798 (8th Cir. 1975). On remand the district court certified that if its judgment notwithstanding the verdict was vacated or reversed, Mobil's alternative motion for a new trial would be granted on the grounds that the verdict was contrary to the clear weight of the evidence; the court erred in its instruction to the jury on the definition of fraud applicable to the facts of the case; and, the jury award for punitive damages was grossly excessive and appeared to have been rendered under influence of passion or prejudice. *Nodak Oil Co. v. Mobil Oil Corp.*, Civil No. 4846 (D.N.D., December 11, 1975). The case is now under final submission to us for full consideration of the merits of Nodak's appeal from the trial court's orders. We reverse the trial court's order granting Mobil judgment notwithstanding the verdict and affirm the trial court's finding that a new trial is warranted on the basis that the punitive damages award is excessive and appears to have been rendered under the influence of passion or prejudice.

In our review of the trial court's order granting judgment notwithstanding the

1. The Honorable Paul Benson, United States District Judge for the District of North Dakota.

verdict we must consider the evidence in the light most favorable to the plaintiff as the party prevailing before the jury. *Griggs v. Firestone Tire and Rubber Co.*, 513 F.2d 851, 857 (8th Cir. 1975); *Hazelo v. Mesenbrink*, 469 F.2d 252 (8th Cir. 1972).

In April 1972 Nodak executed an agreement with Jetstream, Incorporated, to purchase a car wash business owned and operated by Jetstream in Jamestown, North Dakota. On May 1, 1972, Nodak was to begin operation of the business which primarily consisted of the sale of gasoline. Jetstream had a dealer's contract with Mobil under which it had the right to purchase gasoline for retail sale, and in April, Nodak, through its president, Ray D. Mering, began negotiations with Mobil.

Mering went to Kansas City the week of April 3 and discussed with Marvin Houchin, the division general manager of Mobil, the possibility of a jobber's contract[2] and the continuance of the Mobil retail operation at the Jetstream station for the month of May 1972. Mering testified that at the conclusion of this meeting Houchin told him he could operate under the old contract of Jetstream for the month of May.

After further negotiations in April, on May 1, 1972, Ed Heidzig, a Mobil representative, and Herschel Thompson, area manager for Mobil, informed Mering that Nodak could not continue under the contract which Nodak's predecessor, Jetstream, Inc., had with Mobil and that Mobil would not sell to Nodak without a contract. They presented Mering with a retail dealer's contract, a withdrawal letter[3] dated April 28, 1972, which was unsigned by Mobil, a proposed hauling allowance,[4] and a competitive allowance letter.[5] The instruments were executed by Nodak on May 1 and were handed to Thompson along with a letter signed by Mering which read:

> I have signed the attached Retail Dealer contract, Withdrawal letter, and hauling allowance. I will keep Mobil Products in the Jetstream Car wash if all of the above contracts are approved. I will expect manifest and bill of lading instructions prior to May 10, so that I can immediately begin hauling product. I need product immediately and hope to have bill of ladings by Wednesday May 3, 1972.

Mering testified it was his understanding that a proposal was being submitted for one month only and in the meantime Mobil's Thompson and Heidzig would seek approval of a competitive allowance as proposed in the competitive allowance letter. On May 11, 1972, Heidzig advised Mering by telephone that he had been approved to buy the product but that the hauling allowance was not approved yet. Nobody had told Mering at that point that he was not going to get a hauling allowance. Mering then ordered delivery of the product for the next day and also received shipments on three other separate occasions in May. All the loads were hauled by common carrier.

At this point Nodak began negotiating a jobber's contract with Champlin. After a May 17, 1972, meeting between Mering and Champlin's George Morris and John Olive a jobber's contract was executed by Nodak. This one-year contract was to take effect on June 1, 1972, and Nodak offered substantial proof that it had a reasonable expectancy of consummating the foregoing contractual relationship with Champlin if it had not been for the intervening actions of Mobil.[6]

---

**2.** A jobber's contract is distinguishable from a dealer's contract in that it allows the purchaser to obtain Mobil products at wholesale for resale to retail outlets.

**3.** This letter authorized Mobil to withdraw its variable rate competitive allowance (discount off posted prices) upon 90 days notice and in the event of such withdrawal allowed Nodak to terminate the contract.

**4.** This agreement would have allowed Nodak to haul its own product from a pipeline south of Jamestown to the station rather than pay a common carrier for this service.

**5.** This letter was from Mering to Mobil and informed Mobil of the price discounts offered by one of Mobil's competitors and asked Mobil to match the offer in order to secure the Nodak account.

**6.** The testimony of George Morris of Champlin was as follows:

> Q. Now, at the time that the Merings signed the contract on behalf of Nodak Oil Company

On May 25, 1972, Nodak wrote to Mobil's Houchin in Kansas City that he was planning to terminate the Mobil-Jetstream relationship because he was disappointed that he was not making any progress with Mobil.

On May 26, 1972, Mobil's Heidzig and Thompson returned to Mering's office and informed Mering for the first time that Nodak had been denied the right to haul Mobil products. They also presented him with the retail dealer's contract which had been signed by Mobil by this time and a competitive allowance letter which contained different terms than the earlier letter. Mering refused to sign the cover letter which acknowledged that the hauling allowance had been denied.

On May 29, 1972, Mobil's Thompson was notified that the Mobil signs had been removed from the Jetstream station and Champlin signs had been put up. He called John Olive, regional manager for Champlin, and said in Thompson's words:

> Well, I related to him that the Mobil sign had been taken down at the Jetstream Car Wash and the Champlin sign had been put up, and was he aware we had a contract with Mr. Mering?

Olive responded by saying that the Champlin signs would be removed because they were not in the habit of jumping other oil company contracts. Champlin then ceased negotiations with Nodak and refused to discuss the jobber's contract until the Mobil matter was cleared up.

Mering wrote Mobil a second letter on May 31, "cancelling the Retail Dealer Contract between Mobil and Jetstream Car Wash." In response to this letter, J. William Dalgetty, Mobil's attorney, wrote Mering under date of June 6, 1972, asserting that there was no provision in the contract to terminate it prior to April 30, 1973, and threatening Mering with legal damages if he persisted. On the same date, June 6, 1972, Nodak's attorney wrote Mobil's Houchin giving a brief summary of what had happened and advising him that due to a lack of mutuality between Nodak and Mobil the contract presented had not been acceptable and would not be consummated. He also demanded that Mobil give notice to correct any misinformation which had previously been given by Mobil to others. Upon receipt of the June 6 letter from Mobil's Dalgetty, the attorney for Nodak sent a second letter, addressed to Dalgetty and dated June 9, 1972. This letter also stated that there was no contract between Mobil and Nodak, because there had not been mutual agreement on the terms, and asked for immediate confirmation that notice of this fact had been given to Champlin.

Yet another letter was mailed by Nodak's attorney to Mobil's Dalgetty on July 13, 1972, and it included the statement that Champlin still had not been notified that no contract existed and again requested that such notification be immediately sent to Mr. Olive of Champlin. This letter finally elicited a response from Mobil. On July 19, 1972, N. A. Deighton, Mobil's district manager, called Champlin's Olive and, according to Olive's testimony, informed him that Champlin could have Nodak's account. Olive did not recall that Deighton said Mobil was not claiming to have a contract with Nodak.[7] Olive acknowledged the call in a letter to Deighton on July 24, 1972, and

on May 23rd, 1972, had all requirements been met to p it this jobber's agreement with Champlin into effect?
A. Yes.
Q. With the exception of the signature of Champlin?
A. Yes.
Q. Was it your understanding at that time that a deal had been made?
A. Yes.

**7.** Olive's testimony concerning this telephone conversation with Deighton was:

Q. What did he [Deighton] tell you?
A. He informed me in some manner that Champlin could have Nodak Oil as our account since Mobil had reviewed their position, or words to that effect.
Q. Did he tell you Mobil was not claiming to have a contract with Nodak Oil?
A. I don't recall anything other than, you know, what I have indicated there about what he said.

asked for an "appropriate instrument of termination of all agreements between Mobil and Nodak." Mobil did not respond to this request and Deighton's answer to the question as to why he did not, was: "I didn't feel it was necessary that I comply with the letter." Nodak was not apprised of the telephone call from Deighton to Olive, nor of Olive's letter to Mobil. Nodak thereafter was unable to effect a jobber's contract with Champlin, and brought suit against Mobil for "unlawfully, oppressively, fraudulently and maliciously" persuading Champlin not to enter into a contract with Nodak.

The first point raised on appeal by Nodak is that the district court incorrectly required Nodak to prove fraud, or coercion in its claim for actual damages caused by Mobil's interference with its business relationship with Champlin. The trial court relied on *Voss v. Becko*, 192 F.2d 827, 830 (8th Cir. 1951), where this court concluded that under North Dakota law an action for wrongfully inducing a breach of contract may be maintained only by proving that the breach was induced by direct fraud or coercion on the part of the defendant. Nodak alleges that this case wrongfully interpreted North Dakota law. However, we give great weight to the determination of local law by the trial court. *Sherrill v. Royal Industries, Inc.*, 526 F.2d 507, 510 (8th Cir. 1975); *Luke v. American Family Mutual Insurance Co.*, 476 F.2d 1015, 1019 (8th Cir. 1972), *cert. denied*, 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973). The appellant does not provide us any compelling authority to the contrary; therefore, we defer to the district court's interpretation of current North Dakota law on this issue.

Nodak further argues that even if the trial court was correct in ruling that fraud or coercion is a necessary element of an action for interference with business relations, Nodak met the burden of establishing such conduct on the part of Mobil. When considering Mobil's motion for judgment notwithstanding the verdict it was the duty of the trial court to consider the evidence in the light most favorable to Nodak. The

court purported to do exactly that and it found as a matter of law that Nodak had wholly failed to establish fraud. *Nodak Oil Co. v. Mobil Oil Corp.*, 391 F.Supp. 276, 280 (D.N.D.1975). On the contrary, we believe that there was ample evidence from which the jury was justified in finding that Mobil fraudulently induced Champlin not to enter into a contract with Nodak.

The opinion of the trial court in its consideration of the evidence presented by Nodak emphasized the May 29, 1972, call from Mobil's Thompson to Champlin's Olive, and Thompson's statement inquiring "are you aware that Mobil Oil has a contract with Nodak?" Nodak, however, made eight separate allegations of fraud. Thus there is a substantial amount of other evidence, which must be considered in conjunction with this telephone call, to determine if the jury could have properly inferred fraud from the totality of the circumstances.

The trial court found that there could be two interpretations of Thompson's May 29 statement, neither of which could support an allegation of fraud. First, that a contract document had in fact been executed by both parties. Apparently the district court agreed with Mobil's contention that this was a true representation, and thus could not under any circumstances constitute a basis for fraud. *See Nodak, supra,* 391 F.Supp. at 282. The second interpretation would be that the contract document executed by the parties was legally valid and enforceable. According to the trial court this would be a legal representation and under North Dakota law fraud cannot be predicated upon a misrepresentation of law. *Nodak Oil Co. v. Mobil Oil Corp., supra,* 391 F.Supp. at 279–80.

▮ The district court was correct in its statement of the general rule that a misrepresentation of law is not actionable fraud in tort. *Hellebust v. Bonde*, 42 N.D. 324, 172 N.W. 812 (1919). However, under the circumstances the statement by Thompson to Champlin that there was a contract between Nodak and Mobil constituted a representation of fact, although it may technically have also stated a legal conclu-

sion. The statement was not intended to express a legal opinion on the efficacy of the earlier contract negotiations but to point to the existence of a fact. The contention by Thompson that a contract existed implied to Champlin that all of the action and agreement necessary to the formation of a contract had been completed. Here the representation concerned the legal effects of facts not disclosed or otherwise known to the recipient; thus, Champlin justifiably interpreted the statement as implying that there were facts which substantiated the statement. The statement by Mobil, through its agent Thompson, was intended and understood as a statement of fact rather than opinion only and was therefore actionable in a suit for interference with business relations.

■ To support a finding of fraud in a tort action, it was necessary for Nodak to prove that Mobil asserted as a fact that which was not true and for which it had no reasonable grounds to believe was true, or suppressed a fact which it was bound to disclose, or gave information of other facts which were likely to mislead for want of communication of that fact. *See* N.D.Cent. Code § 9–10–02 (1975).[8]

■ In this context it is significant that the person who made the May 29 call, Thompson, was the same person who came to Nodak's office on May 1 to negotiate and who left with all of the documents, including Mering's letter which stated "I will keep Mobil Products in the Jetstream Car wash if all of the above contracts are approved." On cross-examination Thompson admitted that he had read and understood Mering's letter and that he knew that the proposed hauling allowance, one of the contracts referred to in Mering's letter, had not

been approved. The jury may well have decided that it would not take legal training to realize that a contract had not been consummated. Since a layman could ascertain that there was no contract because the terms proposed by Nodak had not been accepted by Mobil, a jury could properly infer that Thompson had no reasonable grounds for believing that there was a contract. Thompson knew on May 29, 1972, that the contract was in dispute and at the very least should have indicated to Champlin that Mobil claimed a contract with Nodak but that Nodak disagreed. A jury might find that the failure to communicate this additional fact is fraud by suppression of a fact by one who has given other facts and the failure to disclose this additional fact is likely to mislead.

The trial court found as a matter of law that Thompson had reasonable grounds for believing that a contract existed because "[a]t the time Mobil telephoned Champlin informing Champlin that Nodak was under contract to Mobil, both Nodak and Mobil believed there was an existing contract, albeit the validity may have been in dispute." *Nodak Oil Co. v. Mobil Oil Corp., supra,* 391 F.Supp. at 282. This is certainly one interpretation which could be drawn from the evidence, but on a motion for judgment notwithstanding the verdict the court is concerned with what the jury actually found, not with what it could have found. It is not the trial court's function to retry the case. Conflicts in testimony are to be disregarded and the evidence most favorable to the nonmoving party is to be accepted and every legitimate inference that may be drawn therefrom must be drawn in favor of the decision of the trier of fact. *Griggs, supra,* 513 F.2d at 851; *Walstad v.*

---

8. The entire statute reads:

> 9–10–02. *Deceit—Definition.*—A deceit within the meaning of section 9–10–03 is:
> 1. The suggestion as a fact of that which is not true by one who does not believe it to be true;
> 2. The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;
> 3. The suppression of a fact by one who is bound to disclose it, or who gives informa-

> tion of other facts which are likely to mislead for want of communication of that fact; or
> 4. A promise made without any intention of performing.

The trial court admittedly gave an erroneous jury instruction based on the contract definition of fraud. The above statute represents the applicable law on which an instruction should be based upon retrial.

*University of Minnesota Hospitals,* 442 F.2d 634, 636 (8th Cir. 1971); *Azalea Drive-In Theatre, Inc. v. Sargoy,* 394 F.Supp. 568, 575–76 (E.D.Va.1975). The testimony of Mering in reference to this issue was that he only had an arrangement with Mobil for one month during which he was permitted to buy gasoline from them. The letters from Mering to Mobil dated May 25, 1972, and May 31, 1972, do not acknowledge a relationship between Nodak and Mobil which extended beyond May 31, 1972, and could be interpreted as simply informing Mobil that Nodak was not expecting any further dealings with Mobil subsequent to May 31, 1972. When so viewed there was evidence of sufficient substantiality to support the decision of the jury and thus the trial court was without power to set the decision aside. *See Fireman's Fund Insurance Co. v. Aalco Wrecking Co., Inc.,* 466 F.2d 179 (8th Cir. 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973).

■ Further evidence of Mobil's fraudulent conduct could be inferred from the refusal by Mobil's Houchin, and its attorney Dalgetty, to notify Champlin that a contract did not exist. Mering testified that he called Houchin on May 31, 1972, and requested Houchin to inform Champlin that they were free to deal with Nodak. Dalgetty received at least one letter from Nodak's attorney, dated June 9, 1972, which asserted that there was no valid contract between Mobil and Nodak and demanded that Champlin be immediately notified of this fact.

The trial court stated that "[t]he evidence of the swift reconsideration and determination of the validity of the total contract package by Mobil's legal department, once the controversy arose, raises an inference of Mobil's good faith." *Nodak Oil Co. v. Mobil Oil Corp., supra,* 391 F.Supp. at 282. It is our view, however, that the jury could reasonably believe that this action by Mobil amounted to suppression of a fact by one who was bound to disclose it. It was Mobil's representative who created the misapprehension of Champlin, and therefore Mo-

bil had a duty to correct the situation. Instead of "swift consideration," the jury may well have felt that it was inexcusable that it took over five weeks for Mobil's corporate counsel to determine that there was no contract, and as a result of this delay Nodak was unable to consummate a jobber's contract with Champlin. From the facts that Mobil refused to respond for this length of time, and then only in the most minimal possible manner, an inference of Mobil's bad faith may have been raised rather than the inference of good faith alluded to by the trial court.

At the time Mobil's Thompson called Champlin and at the time Houchin and Dalgetty refused to rectify the erroneous impression harbored by Champlin as a result of Thompson's representation that Mobil had a contract with Nodak, Mobil had in its possession all of the facts and all of the letters and other documents which indicated that no contract existed between Nodak and Mobil. In this context the trial court states, in its order granting Mobil's motion for judgment notwithstanding the verdict, that "[s]ome time later, Mobil's legal department determined that because Mobil had not accepted all the terms as proposed by Nodak, no contract existed between the two." *Nodak Oil Co. v. Mobil Oil Corp., supra,* 391 F.Supp. at 279. However, a permissible inference which the jury may have drawn from the evidence is that the Mobil employees knew all along that no valid contract existed—they may have thought that by bluffing with threats and other coercive conduct Mobil could obtain its desired goals regardless of any legal consequences.

■ Mobil is correct in its assertion that to be guilty of the tort of interference with a business relationship, its fraudulent conduct must have been directed at Champlin and Champlin must have justifiably relied on such conduct in being induced not to enter into a contract with Nodak. Another encounter between Mobil and Champlin from which a jury could possibly infer such fraudulent conduct was the meeting between Champlin's George Morris and Mobil's representatives in Fargo, North Dako-

ta, on about May 30, 1972. Morris requested this meeting with Mobil's representatives, one of whom was Thompson, to discuss the status of the contract Mobil alleged it had with Nodak. Nevertheless, Mobil made no disclosure to Morris of the underlying facts on which its conclusion that it had a contract with Nodak was founded and neglected to show Morris a copy of the alleged contract.[9]

In these circumstances, where Mobil had created the erroneous impression that a contract existed, a jury could find that this was fraud by suppression and that Champlin was justified in relying on Mobil's statements because it did share the knowledge that Mobil had of the events that served to create, or failed to create, the contractual relationship which Mobil claimed existed. If Morris had been shown all of the documents which Thompson had taken to the Mobil office in Fargo on May 1, 1972, he would have had the knowledge on which to make an informed decision. Then, perhaps, he would not have been justified in relying on Mobil's statements designed to dissuade Champlin from consummating a contract with Mobil.

Mobil refused to make any attempt to undo the harm caused by Thompson's original statement of May 29, 1972, until July 19, 1972. At that time Mobil's Deighton called Champlin's Olive to inform him that Champlin was free to deal with Nodak, but Mobil still refused to give any written confirmation of its reversal in position regarding the existence of a contract, despite Champlin's request that it do so. The trial court apparently was of the opinion that after the July 19 call Champlin ceased to rely on the earlier misrepresentation by Mobil as its reason for not doing business with

Nodak.[10] However, this is directly contradicted by the testimony of Champlin's Olive. He stated that if at that time Champlin had received written confirmation of the fact that no contract existed between Mobil and Nodak, then normal negotiations would have continued.

█ Mobil takes the position that even if Champlin was still relying on Mobil's earlier representation, it was not justified in doing so and that Mobil's failure to send written confirmation did not constitute fraudulent conduct. We disagree. It was Mobil who supplied the original misinformation; thus it had a duty to see that such misinformation was fully retracted. In the absence of written confirmation, Champlin was justified in relying on the earlier misrepresentation because it understandably had a strong desire to avoid becoming involved in a complex legal entanglement which might become the subject of litigation. Mobil knew that it had no contract with Nodak; yet it failed to notify Champlin of this fact in such a manner as to dispel the earlier erroneous impression it had created. Under North Dakota law, the failure to do so is fraud by suppression of the fact that no contract existed.

Under North Dakota law, "the existence of fraud is ordinarily a question of fact to be decided by the trier of the facts." *Buehner v. Hoeven*, 228 N.W.2d 893, 903 (N.D. 1975). *See* N.D.Cent.Code § 9–03–10 (1975). The United States Supreme Court has aptly observed "[w]henever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them

---

**9.** During Morris' testimony concerning this meeting, the following exchange transpired:

Q. What took place, and what purpose was that?

A. I talked to three gentlemen, this Mr. Herschel Thompson, and the other two I don't recall. I don't believe Mr. Deighton was one of them.

We discussed the situation that we had existing around Nodak Oil Company. I still did not see a copy of the so-called contract.

I was told by one of the three gentlemen in this meeting that Mr. Mering was free, white, 21, should have realized what he was selling—or what he was signing, and was going to have to live with it.

**10.** "Nodak succeeded in convincing Mobil it did not have a legally enforceable contract, but its simultaneous dealings with both companies appears to have caused both to lose interest." *Nodak Oil Co. v. Mobil Oil Corp., supra,* 391 F.Supp. at 283.

to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear." *Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916, 923 (1946).

On the question of whether Mobil was guilty of fraudulently inducing Champlin not to enter into a business relationship with Nodak, the evidence presented was such that reasonable men may differ as to the answer. Therefore, the determination should properly be left for the jury.

In its certificate issued December 11, 1975, the district court has also ruled that in the event its judgment notwithstanding the verdict is reversed, Mobil is entitled to a new trial because, among other reasons,[11] the jury award for punitive damages is grossly excessive and appears to have been rendered under influence of passion and prejudice.

■ A motion for a new trial is independent from a motion for judgment notwithstanding the verdict and is governed by different principles, with the trial judge traditionally given greater latitude when ruling on a motion for a new trial. *See Simpson v. Skelly Oil Co.,* 371 F.2d 563, 566–67 (8th Cir. 1967); *Seven Provinces Insurance Co., Ltd. v. Commerce & Industry Insurance Co.,* 65 F.R.D. 674, 679 (W.D.Mo. 1975). Generally, this court has upheld the exercise of the trial court's grant of a new trial as within its discretion. *Silverthorn v. Hennigan,* 439 F.2d 704 (8th Cir. 1971); *Bates v. Hensley,* 414 F.2d 1006, 1011 (8th Cir. 1969); *Simpson, supra.*

■ Nodak's primary argument against the granting of a new trial because the trial court determined the verdict was excessive is based on the North Dakota case of *Skjonsby v. Ness,* 221 N.W.2d 70 (N.D.1974). In that case the North Dakota Supreme Court set the standard of when a trial court may reverse or reduce an award of punitive damages for being excessive. Under North

Dakota law, as delineated in *Ness,* it is entirely possible that the trial court would have reached a different conclusion as to whether a new trial should have been awarded for the reason that the award of punitive damages was excessive. However, even in a case where the jurisdiction of United States District Court is founded on diversity of citizenship, the standard of review with respect to a motion for a new trial on the basis of excessive damages is determined by federal law. *Galard v. Johnson,* 504 F.2d 1198, 1200 n. 1 (7th Cir. 1974). *See also Novak v. Gramm,* 469 F.2d 430, 434–35 (8th Cir. 1972); 6 J. Moore, Federal Practice ¶ 59.04[1] (2d ed. 1974).

■ In *Solomon Dehydrating Co. v. Guyton,* 294 F.2d 439, 447–48 (8th Cir. 1961), Judge Blackmun, now Justice Blackmun, discussed the standard of review in this circuit of a trial court's decision on the question of excessive damages. In summarizing he stated that:

[I]n our opinion, inadequacy or excessiveness of a verdict is basically, and should be, a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses and which knows the community and its standards; that this is a responsibility which, for better working of the judicial process and for other seemingly obvious reasons, is best placed upon its shoulders; and that we shall continue to consider review, as we have said before, not routinely and in every case, but only in those rare situations where we are pressed to conclude that there is "plain injustice" or a "monstrous" or "shocking" result.

In this circuit that test has been consistently adhered to. *E.g., Richardson v. CWA,* 530 F.2d 126 (8th Cir. 1976); *Slatton v. Martin K. Eby Construction Co.,* 506 F.2d 505 (8th Cir. 1974), *cert. denied,* 421 U.S. 931, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975); *Snodgrass v. Nelson,* 503 F.2d 94 (8th Cir. 1974); *Scoville v. Missouri Pacific R. R.,* 458

---

11. As previously indicated the district court also certified that a new trial was warranted because: "The verdict is contrary to the clear weight of the evidence; The Court erred in its instruction to the jury on the definition of fraud applicable to the facts of the case."

F.2d 639 (8th Cir. 1972); *Century "21" Shows v. Owens,* 400 F.2d 603 (8th Cir. 1968).

Thus in order to reverse the district court's decision to grant a new trial because of excessive damages we would have to find that if we let the decision stand there would be "plain injustice" or a "monstrous" or "shocking" result. The result that would be reached under North Dakota law is just one factor to be considered by this court in determining whether the trial court has abused its discretion under the test set out in *Solomon. Novak v. Gramm, supra,* 469 F.2d at 434. Here the jury award of punitive damages was $100,000, the exact amount requested by Nodak, while actual damages of only $733.42 were awarded.

■ "In summary, we will not disturb a trial court's grant of a new trial for an excessive verdict absent a clear abuse of discretion." *Richardson v. CWA, supra,* 530 F.2d at 130. After a careful review of the arguments advanced by both parties we are unable to say that the district court abused its discretion in granting a new trial because of excessive damages. Therefore, we do not decide whether a new trial was also warranted on the other grounds proposed by the trial court.

■ Nodak also urges this court to rule on whether the trial court erred in limiting the proof of actual damages to the period of June 1, 1972, through May 31, 1973, the period specified on the proposed contract between Champlin and Nodak. The contract contained an annual renewable provision unless terminated at the end of the initial or any subsequent period upon 30 days notice. Nodak made an offer of proof that Champlin had not terminated a jobber's contract during the preceding five years. In addition, Nodak sought to show that the Mandatory Petroleum Allocation Regulations, which went into effect in January 1974, would have required Champlin to provide products to meet Nodak's current needs from June 1, 1974, through December 31, 1974. Therefore, Nodak asserts that this period should also have been included in the computation of actual damages. In this connection Nodak made an offer of proof with respect to the additional damages suffered on account thereof, and those arising during the additional five years.

The trial court, on the basis of *Western Oil & Fuel Co. v. Kemp,* 245 F.2d 633 (8th Cir. 1957), limited Nodak's damages to one year. Appellant Nodak has failed to furnish this court with any persuasive authority indicating that the district court erred in doing so. Under the circumstances we see no reason for departing from our rule of giving great weight to the determination of local law by the trial court.

The judgment in favor of Mobil notwithstanding the verdict is reversed. The conditional grant of a new trial is affirmed. Inasmuch as the issues of liability, actual damages and punitive damages are intertwined, the new trial should encompass all issues.